## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DOUGLAS McCLINTOCK,** | : | **No. 3:20cv1548** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **ATTORNEY GENERAL MERRICK** | : | |
| **B. GARLAND, U.S. DEPARTMENT OF** | : | |
| **JUSTICE,** | : | |
| **Defendant** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### MEMORANDUM

This is an employment discrimination action filed by Plaintiff Douglas

McClintock against the United States Department of Justice[1] pursuant to the

federal-sector provision of the Age Discrimination in Employment Act of 1967, 29

U.S.C. § 633a ("ADEA").  Before the court is a motion for summary judgment

filed by the defendant. (Doc. 35).  Having been fully briefed, this matter is ripe of

a decision.

**Background**

Plaintiff previously worked for the Department of Justice, specifically the

Federal Bureau of Prisons ("BOP") at Federal Correctional Institution-Schuylkill

---

[1] Plaintiff initiated this action against William P. Barr. (Doc. 1, Compl.).  Pursuant to Federal Rule of Civil Procedure 25(d), Merrick B. Garland is automatically substituted as the party defendant in his role as the current Attorney General and head of the United States Department of Justice.

("FCI-Schuylkill") near Minersville, Schuylkill County, Pennsylvania.[2] (Doc. 40, SOF ¶¶ 2-3). In his amended complaint, plaintiff alleges that, from about May 2019 and onward, executive staff at FCI-Schuylkill subjected him to age discrimination. (See Doc. 13). He also alleges that this treatment constituted a pattern of harassment, which was so severe and pervasive that it constituted a hostile work environment. (Id. ¶ 17). Plaintiff takes the position that such harassment was designed to render him a "vestigial employee or force him to retire[.]" (Id. ¶ 18).

Plaintiff was born in 1969 and resides in Montgomery, Lycoming County, Pennsylvania.[3] (Doc. 46-3, Pl. Decl. ¶ 1, Doc. 40-2, Pl. Dep. 6:19-21). He was hired by the BOP as a staff paramedic at Federal Correctional Complex-Allenwood ("FCC-Allenwood") in December 2001. (Doc. 40-2, Pl. Dep. 9:15-19). Plaintiff transferred to FCI-Schuylkill in 2013 when he was promoted to Assistant Health Services Administrator ("ASHA"). (Id. 9:20-23). FCC-Allenwood is located

---

[2] Unless noted otherwise, the court cites to the defendant's concise statement of material facts ("SOF"), (Doc. 40), for facts which the plaintiff admitted in its response to the SOF, (see Doc. 46-1). The court also cites to the SOF for certain disputed facts as noted in the body of this memorandum. All facts from the record are construed in a light most favorable to plaintiff as the nonmoving party. See Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 187 (3d Cir. 2015)(citation omitted).

[3] The government filed a motion relative to replacing the pages of plaintiff's deposition attached in support of the motion for summary judgment. (Doc. 48). The motion will be granted in part. Instead of replacing the pages, the court will consider the deposition pages originally attached, (Doc. 40-2), and the pages included with the subsequent motion, (Doc. 48-3).

near plaintiff's residence, while the ASHA position at FCI-Schuylkill required a

one-hour commute each way. (See Doc. 13, Am. Compl. ¶¶ 60, 62; Doc. 48-3,

Pl. Dep. 37:1-13).  In his role, plaintiff worked Monday through Friday, 7:30 AM to

3:30 PM ("day watch") in an inmate facing position within the secure confines of

the prison. (See Doc. 46-14, Pl. Exh. 12, 12/12/19 Office of Internal Affairs

Referral, ECF pp. 9, 14).  Upon transferring to FCI-Schuylkill, plaintiff started a

van pool with other staff members to commute from Montgomery to Minersville.

(Doc. 46-20, Pl. Memo to S. Finley 08/05/2020).

Plaintiff alleges that he began experiencing age discrimination in May 2019

after he applied for FCI-Schuylkill's Health Services Administrator ("HSA")

position. (Doc. 13. Am. Compl. at ¶¶ 19-20).  The finalists for this vacant position

were plaintiff and Bret Brosious. (Id. ¶ 20).  BOP selected Brosious as the

prison's new HSA. (Doc. 40, SOF ¶ 11).  Plaintiff asserts that the decision to hire

Brosious was based on plaintiff's age because plaintiff had more experience and

familiarity with the institution than Brosious.  At the time the HSA position was

filled, Plaintiff was 49 years old and Brosious was 39 years old.  (See Doc. 46-3

Pl. Decl. ¶ 1; Doc. 46-12, B. Brosious Dep. 6:21-22).

The younger Brosious thus became plaintiff's "front-line supervisor." (Doc.

40-12, B. Brosious Decl. ¶ 5).  Per Brosious, plaintiff's role under his supervision

"included, among other duties, providing oversight of the day-to-day operations of

3

the Health Services Department (HSD), which included scheduling, monitoring the budget, supervising health services personnel, supervising inmates in the HSD, acting for [Brosious] in [his] absence, and other duties as assigned." (Doc. 40-12, B. Brosious Decl. ¶ 6).  Plaintiff's day-to-day duties were performed in collaboration with Brosious and the prison's Clinical Director. (Id.)

Plaintiff was eligible for retirement in December 2021 upon completion of twenty (20) years of service to the BOP. (Doc. 46-3, Pl. Decl. ¶ 2).  As the result of not receiving the promotion to the HSA position in May 2019, however, plaintiff notified his supervisors that he could no longer retire upon his eligibility date. (Id. ¶ 4).

Under the prior HSA at FCI-Schuylkill, plaintiff was accustomed to being included in meetings and decision making for the entire Health Services Department. (Doc. 46-1, Pl. Decl. ¶ 7).  As discussed further below, plaintiff later complained about discriminatory treatment from Brosious to his agency's Equal Employment Office ("EEO") and engaged in pre-complaint counseling, meaning he consulted an EEO counselor to try to informally resolve the matters prior to filing a formal administrative complaint.  During EEO counseling, a nurse in the Health Services Department advised that starting in September or October 2019, staff were informed not to report to plaintiff any longer as plaintiff was not in a supervisory role. (Doc. 46-5, EEO Counselor's Report, ECF p. 10).

4

Then, in December 2019, an inmate accused plaintiff of using improper force while that inmate was being restrained. (Doc. 40, SOF ¶ 26). The prison placed plaintiff under internal investigation. (Id. ¶ 30). The internal investigation is still open.[4] (Id. ¶¶ 9, 38). Per plaintiff, the inmate was later placed in restrictive housing and transferred out of the prison, but plaintiff continued to be isolated from the Health Services Department. (Doc. 13, Am. Compl. ¶¶ 88, 96-97)

At the onset of the investigation, Brosious notified plaintiff of changes to his work assignment on December 17, 2019. (Doc. 46-15, B. Brosious Memo, 12/17/2019). Per that reassignment memo, plaintiff was tasked with monitoring inmate phone calls and emails in the prison's computer lab along with duties relative to the Health Services Department. (Id.) He was directed not to respond to emergencies or go beyond the prison's control center. (Id.) Regarding a meeting with a new billing vendor in January 2020, plaintiff believed his attendance was within his duties as ASHA, but Brosious believed plaintiff was not required to attend since Brosious was overseeing the contract. (See Doc. 40-12, B. Brosious Decl. ¶ 13). A member of the department later told an EEO counselor that "most of the time" plaintiff would be involved in a meeting like this. (46-5, EEO Counselor's Report, ECF p. 10).

---

[4] Neither party references any separate litigation regarding this incident.

Subsequently, in a February 4, 2020 memorandum, Brosious reassigned plaintiff outside the main FCI buildings to the prison's satellite camp. (Doc. 46-16, B. Brosious Memo, 02/04/2020).  According to Brosious, Warden Scott Finley made the decision to move plaintiff to the satellite camp. (Doc. 40-12, B. Brosious Decl. ¶ 8).  Per the reassignment memo, plaintiff's duties did not include any tasks relative to the Health Services Department but included requirements that plaintiff monitor inmate phone calls for a longer period of his workday. (Id.)

On plaintiff's first day at the satellite camp, February 5, 2020, Brosious emailed plaintiff after 2:00 PM to retrieve a box from FCC-Allenwood, near plaintiff's home. (Doc. 40-12, B. Brosious Decl. ¶ 14).  Per plaintiff, however, the email was sent in such a manner that plaintiff did not see it until the following workday after he commuted past FCC-Allenwood on his way to FCI-Schuylkill. (Doc. 13, Am. Compl. ¶¶ 60-65).  Plaintiff alleges that he completed the assignment on February 6, 2020, and later discovered the box was not needed for several days. (Id. ¶¶ 66-67).  Brosious made comments asking plaintiff how he liked his new office, i.e., the satellite camp, and remarking that plaintiff would not be allowed back in the main institution. (Doc. 46-3, Pl. Decl. ¶¶ 14-15). Plaintiff perceived this treatment by Brosious as moving him further away from the Health Services Department. (Doc. 48-3, Pl. Dep. 42:6-20).

6

Thereafter, Brosious advised plaintiff of another reassignment in a memorandum dated March 5, 2020. (Doc. 46-17).  Per the memorandum, the prison reassigned plaintiff to respond to medical emergencies, perform pill lines, conduct sick call triage when a provider was absent, and administer immunizations and tuberculosis testing (PPDs) at the satellite camp's clinic. (Id.)  On March 12, 2020, the prison's Clinical Director and Pharmacist provided plaintiff with retraining. (Id.)  Plaintiff alleges that the retraining lasted thirty (30) minutes. (Doc. 13, Am. Compl. ¶ 82).  The Clinical Director testified that she had reservations about plaintiff performing these newly assigned tasks. (Doc. 40-6, E. Mace Liebson Dep. 34:15-21).  Plaintiff testified that he did not feel comfortable performing those duties as a sole provider since he had not provided direct medical care since he was a BOP paramedic, seven (7) years earlier. (Doc. 40-2, Pl. Dep. 47:7-18).  Brosious was aware that plaintiff had not provided patient care for several years. (Doc. 40-12, B. Brosious Decl. ¶10).

On March 17, 2020, plaintiff first reached out to the agency's EEO counselor. (Doc. 40, SOF ¶ 75).  Then, on March 25, 2020, plaintiff drafted a memorandum to the Clinical Director and copied Brosious. (Doc. 46-18).  In that memorandum, plaintiff advised that he had not been clinically active as a paramedic since April 2013 and expressed his discomfort with being a sole medical provider. (Id.)  He also attached a prison program statement requiring

7

clinically active ASHAs to "have a current practice agreement or protocols pertinent to their professions prior to performing any clinical duties." (Id.). Plaintiff's memo also indicates that he let his paramedic privileges lapse and was in the process of dropping his paramedic certification to a basic-emergency medical technician. (Id.)

Within hours of plaintiff submitting the memorandum, Brosious reassigned plaintiff from the satellite camp to the lobby of the main institution where he was tasked with performing COVID-19 screening of all staff reporting for duty at the prison. (Doc. 46-19). Prison officials moved plaintiff from day watch to the night watch, 3:00 PM to 11:30 PM. (Id.) These officials also changed plaintiff's days off from Saturday and Sunday to Monday and Tuesday. (Id.) Per plaintiff, the shift and schedule changes created financial and family care issues. (Doc. 13, Am. Compl. ¶¶ 30-31, 87, 91). Ultimately, plaintiff would not return to day watch on a Monday to Friday schedule until July 2021. (Doc. 46-25, B. Brosious Memo 07/22/2021).

From March 2020 until he retired, plaintiff was either involved in EEO counseling or this litigation. During EEO counseling, on April 7, 2020, Brosious issued a performance evaluation regarding the plaintiff. (Doc. 40-9, ECF p. 2). Plaintiff's overall summary rating equated to "achieved results minimally" versus higher ratings of "excellent" or "outstanding." (Id.) On March 27, 2021, Brosious

8

provided higher category ratings, but plaintiff missed an "excellent" rating by one point and remained in the "achieved results minimally" category. (Id., ECF p. 9). Plaintiff alleges that prior to Brosious's hire as HSA, plaintiff received "outstanding" or "excellent" evaluations. (Doc. 13, Am. Compl. ¶ 98).  Per his allegations, an "achieved results" evaluation prevents a BOP employee from being eligible for promotion at the management level. (Id. ¶ 101).  This, in turn, impacted plaintiff's retirement benefit amounts. (Id. ¶¶ 34, n. 5; 102).

Also during EEO counseling, on May 27, 2020, the acting associate warden issued a memorandum to plaintiff regarding professional conduct. (Doc. 46-23). Per the prison, the memorandum was issued because two employees were intimidated by comments made by the plaintiff. (Doc. 40, SOF ¶ 64).  Per the plaintiff, the associate warden verbally told him that the memorandum was issued to everyone and was "just a reminder." (Doc. 46-3, Pl. Decl. ¶ 17).

On June 20, 2020, the agency's EEO counselor issued a report after interviewing several witnesses, including Brosious, Warden Finley, the Clinical Director, and the acting associate warden. (Doc. 46-5).  EEO counseling did not resolve any issues raised by the plaintiff. (Id.)  Plaintiff did not file a formal EEO complaint, however, and proceeded with this litigation.

Plaintiff also alleges that, in July 2020, all other members of the Health Services Department received a retention incentive, but he did not. (Am. Compl.

¶¶ 138-140).  The defendants indicate that plaintiff did not receive the incentive because he let his clinical privileges lapse. (Doc. 40, SOF ¶¶ 70, 72).  In a declaration, plaintiff states that "he was told that retention incentives were offered to all employees" in the Health Services Department. (Doc. 46-3, Pl. Decl. ¶ 18).

Additionally, plaintiff avers that his subsequent requests for schedule modifications were regularly denied. (Doc. 13, Am. Compl. ¶ 120).  Regarding that issue, he sent a memorandum to Warden Finley dated August 5, 2020. (Doc. 46-20).  In that memo, he advised Warden Finley: "It has come to my attention Mr. Brosious is continually allowing younger Health Services Staff the opportunity to modify their work schedules.  Plain and simple, this is a further example of your continual disparate treatment." (Id.)

Warden Finley denied the request for a schedule change. (Doc. 46-20, Pl. Memo to S. Finley 08/05/2020).  Per plaintiff's averments, Warden Finley also called the plaintiff into his office regarding plaintiff's comments in the memorandum and berated him in front of Brosious. (Doc. 13, Am. Compl. ¶ 122).  Warden Finley also allegedly told plaintiff, "you can tell your attorney or whomever you need." (Id. ¶ 129).  Warden Finley, on the other hand, testified that he did not recall such a meeting. (Doc. 40-4, S. Finley Dep. 90:6-19).  Plaintiff included these allegations against Warden Finley in his initial complaint, filed in this court on August 27, 2020. (Doc. 1, Compl. ¶¶ 105-107).

10

Approximately one month later, on September 30, 2020, Brosious provided plaintiff with notice that Brosious would be monitoring plaintiff's future use of sick leave and issued plaintiff a sick leave counseling memo. (Doc. 46-24, B. Brosious Memo 46-24).  Brosious advised plaintiff that his current work assignment and schedule would remain unchanged, i.e., he would continue to monitor staff for COVID-19 symptoms on the night watch. (Id.)  Per Brosious, when the two met to discuss plaintiff's use of sick leave, plaintiff accused Brosious of harassing him. (Id.)

Plaintiff retired in December 2021. (Doc. 40, SOF ¶ 9).  As of plaintiff's last duty reassignment, in July 2021, he was tasked with monitoring 350 minutes of inmate phone calls and 50 inmate emails per workday. (Doc. 46-25, B. Brosious Memo to Pl. 07/22/2021)).

Based on the above events, plaintiff's amended complaint raises five separate claims under the federal-sector provision of the ADEA.  Count I is an overarching claim for age discrimination recounting most of the events discussed above. Count II focuses on the post-EEO counseling claim that younger members of the prison's Health Services Department were being approved for schedule modifications while plaintiff's requests were continually denied. (Id. ¶¶ 119-127).  Count III is a claim for retaliation based on comments made by Warden Finley after he denied plaintiff's written request for a schedule

modification. (Id. ¶¶ 128-136).  Count IV focuses on a claim that plaintiff was denied a retention incentive in July 2020 while all other members of the Health Services Department received that bonus. (Id. ¶¶ 137-144).  Count V asserts that plaintiff applied for numerous job postings within the BOP but was denied due to "bad vouchers" from executive staff at FCI-Schuylkill, i.e., not recommending him for these positions.  (Id. at ¶¶ 145-152).  Counts I-II and IV-V also assert hostile work environment claims.

After the close of discovery, the government moved for summary judgment on all claims. (Doc. 35).  Plaintiff did not oppose the government's arguments regarding "bad vouchers" in his response to the motion for summary judgment or otherwise brief the issue.  The government's motion for summary judgment will be granted as to Count V of the amended complaint without additional discussion.  Otherwise, plaintiff's remaining claims have been fully briefed and are ripe for disposition.

**Jurisdiction**

Because this case is brought pursuant to the ADEA, the court has jurisdiction pursuant to 28 U.S.C. § 1331. ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). The court has supplemental jurisdiction over plaintiff's PHRA claims pursuant to 28 U.S.C. § 1367(a). ("In any civil action of which the district

courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.").

**Standard of Review**

The defendant has filed a motion for summary judgment.  Granting summary judgment is proper " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " See Knabe v. Boury Corp., 114 F.3d 407, 410 n. 4 (3d Cir.1997) (quoting FED. R. CIV. P. 56(c)).  "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir.1990).  The burden is on the moving party to demonstrate that the evidence is such that a

reasonable jury could not return a verdict for the non-moving party. Anderson, 477 U.S. at 248 (1986).  A fact is material when it might affect the outcome of the suit under the governing law. Id.  Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. Id. at 324.

"In employment discrimination cases, the summary judgment standard 'is applied with added rigor' because 'intent and credibility are crucial issues.' " Walden v. St. Gobain Corp., 323 F.Supp. 2d 637, 641 (E.D. Pa. 2004)(quoting Stewart v. Rutgers Univ., 120 F.3d 426, 431 (3d Cir. 1997)).  Moreover:

> Employment discrimination cases center around a single question: why did the employer take an adverse employment action against plaintiff? Because this is clearly a factual question, summary judgment is in fact rarely appropriate in this type of case. Simply by pointing to evidence which calls into question the defendant's intent, the plaintiff raises an issue of material fact which, if genuine, is sufficient to preclude summary judgment.

14

<u>Marzano v. Computer Sci. Corp. Inc.</u>, 91 F.3d 497, 509–10 (3d Cir. 1996)(internal quotations and explanatory parentheticals omitted).

**Analysis**

The government moves for summary judgment arguing that the record cannot support the plaintiff's claims for age discrimination and retaliation. Prior to addressing the evidence related to these claims, the court will take up a threshold issue raised by the government: whether plaintiff exhausted his administrative remedies prior to filing suit.

### 1.    Exhaustion of Administrative Remedies

Plaintiff's claims arise under a provision of the ADEA applicable to certain federal-sector employment, 29 U.S.C. § 633a.[5]  The statute provides two alternate avenues for pursuing a claim of age discrimination.  <u>Stevens v. Dep't of Treasury</u>, 500 U.S. 1, 5, (1991).  The first avenue permits an individual to "invoke the EEOC's administrative process and then file an action in federal court if he is not satisfied with his administrative remedies." <u>Id.</u> (citing 29 U.S.C. § 633a(b), (c)).  Regarding the second avenue, "[a] federal employee complaining of age discrimination. . .does not have to seek relief from his employing agency or the EEOC at all.  He can decide to present the merits of his claim to a federal court in the first instance." <u>Id.</u> at 6 (citing 29 U.S.C. § 633a(d)).  For employees in the

---

[5] It is undisputed that plaintiff falls within the class of federal employees covered by the ADEA.

Third Circuit, however, "[t]he ADEA…requires a plaintiff to exhaust all available remedies when she elects to proceed administratively." Slingland v. Donahoe, 542 F. App'x 189, 191 (3d Cir. 2013)(citing Purtill v. Harris, 658 F.2d 134, 138–39 (3d Cir. 1981)); see also Schultz v. Goldbelt Glacier Health, 713 F. App'x 121, 126 (3d Cir. 2017)("Once the plaintiff has chosen to initiate the administrative process…she must see it through before filing a lawsuit.")(citing Purtill).

In this matter, it is undisputed that plaintiff participated in pre-complaint counseling.  Plaintiff first reached out to an EEO counselor on March 17, 2020. (Doc. 40, SOF ¶ 75).  On April 28, 2020, plaintiff completed the paperwork required for EEO counseling. (Doc. 46-4, ECF p. 3).  Over the next six weeks, the EEO counselor engaged in a pre-complaint investigation and interviewed witnesses before issuing a report. (Doc. 46-5).  That report reflected a chronology of EEO counseling, plaintiff's allegations of discrimination, the remedies requested, and the EEO counselor's inquiry into the matter with details of interviews conducted. (Id. at ECF p. 6-12).  As part of the counseling process, the EEO counselor interviewed Warden Finley on June 9, 2020. (Id. ECF p. 11). Warden Finley indicated he could not grant plaintiff's requested remedies. (Id.) Consequently, the EEO counselor emailed plaintiff's counsel with a notice of a right to file a formal complaint of discrimination with the agency. (Id. ECF p. 12). That notice indicated that if plaintiff elected to file a complaint that it must be in

writing, signed, and filed within (15) days after receipt of the notice. (Id. ECF p. 2).

On June 29, 2020, after that fifteen (15) day period had passed, plaintiff's counsel emailed the EEOC's Office of Federal Operations notifying them of plaintiff's intention to file a civil action in federal court for his ADEA claims. (Doc. 46-6).  On August 27, 2020, about sixty (60) days later, plaintiff instituted this action. (Doc. 1).

Thus, plaintiff invoked administrative processes and sought pre-complaint counseling and conciliation, but then he changed course and sued in federal court after counseling was unsuccessful and the time for filing a formal complaint with the agency expired.  The government argues that what plaintiff did was improper and requires a determination that administrative remedies were not exhausted.  The court disagrees.  As discussed below, a federal employee alleging age discrimination can move from administrative proceedings to a civil action during or after pre-complaint counseling so long as they do not file a formal complaint of discrimination with the agency.

Pursuant to the federal-sector provision of the ADEA, "[a]ny person aggrieved may bring a civil action in any Federal district court of competent jurisdiction[.]" 29 U.S.C. § 633a(c).  The statutory prerequisites are that:

> When the individual **has not filed a complaint concerning age discrimination** with the Commission, no

17

civil action may be commenced by any individual under this section until the individual has given the Commission not less than thirty days' notice of an intent to file such action. Such notice shall be filed within one hundred and eighty days after the alleged unlawful practice occurred.

29 U.S.C. § 633a(d)(emphasis added).

In this matter, the plaintiff did not file "a complaint concerning age discrimination with the Commission" as contemplated by the statute. Rather, plaintiff filed an administrative request for pre-complaint counseling with his agency. (Doc. 46-4). Under EEOC regulations, such a request is a prerequisite to an administrative complaint of discrimination, see 29 C.F.R. § 1614.105(a), § 29 C.F.R. § 1614.106(b), but it is not an actual complaint, which would start the administrative proceedings in earnest, see 29 C.F.R. § 1614.108 (setting forth how complaints are investigated).

The regulations also reflect that an aggrieved person retains the right to file suit if pre-complaint proceedings are initiated. During the initial counseling session, the regulations require counselors to "advise individuals in writing of their rights and responsibilities, including…the right to file a notice of intent to sue pursuant to [29 C.F.R.] § 1614.201(a) and a lawsuit under the ADEA **instead of an administrative complaint** of age discrimination[.]" 29 C.F.R. § 1614.105(b)(1) (2009) (emphasis added). Moreover, the regulation referenced in that section provides: "**As an alternative to filing a complaint under this part**,

18

an aggrieved individual may file a civil action in a United States district court under the ADEA against the head of an alleged discriminating agency after giving the Commission not less than 30 days' notice of the intent to file such an action." 29 C.F.R. § 1614.201 (2009) (emphasis added).  These regulations do not otherwise lock a person into making an administrative complaint of discrimination after pre-complaint counseling is initiated or after such counseling is completed.

By not filing a complaint of discrimination after counseling, plaintiff retained the right to file a lawsuit upon thirty days' notice to the EEOC. 29 U.S.C. § 633a(d).  Plaintiff has provided records indicating such compliance. (Doc. 46-6). Plaintiff thus exhausted his administrative remedies, and the court will move on to consideration of the government's other arguments.

### 2. Plaintiff's Age Discrimination Claims

Section 633a(a) provides "that 'personnel actions' affecting individuals aged 40 and older 'shall be made free from any discrimination based on age.' " Babb v. Wilkie, 589 U.S. 399, 402 (2020)(quoting 29 U.S.C. § 633a(a)).  As interpreted, the ADEA federal-sector provision "demands that personnel actions be untainted by any consideration of age." Id.

Section 633a(a) may be violated without a showing that age was the but-for cause of an employment decision.  See id. at 404, 408.  Nonetheless, "but-for causation is important in determining the appropriate remedy." Id. at 413.  To

obtain "reinstatement, backpay, compensatory damages, or other forms of relief related to the end result of an employment decision...plaintiffs must show that age discrimination was a but-for cause of the employment outcome." Id.  If a plaintiff can only demonstrate "that age was a but-for cause of differential treatment in an employment decision but not a but-for cause of the decision itself[,]" other remedies may be appropriate, such as injunctive or other forward-looking relief. Id. at 414.

ADEA claims with circumstantial evidence of age discrimination are analyzed using the framework provided in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–03 (1973).[6]  Fowler v. AT&T, Inc., 19 F.4th 292, 298 (3d Cir.

---

[6] There is a question as to whether McDonnell Douglas applies in federal-sector Title VII and ADEA cases based on the holding in Babb and how the Eleventh Circuit proceeded upon remand. See Rajendran v. Wormuth, No. 3:22-CV-00581, 2024 WL 1356701, at *11, n. 26 (M.D. Pa. Mar. 29, 2024)(Schwab, M.J.)(citing Babb v. Sec'y, Dep't of Veterans Affs., 992 F.3d 1193, 1204 (11th Cir. 2021) and collecting cases post-Babb applying McDonnell Douglas).

In this matter, however, the plaintiff seeks a full array of remedies, including forms of relief related to the end result of the employment decisions. (Doc. 13, Am. Compl. Requests for Relief).  To obtain the full relief demanded in this action, the plaintiff must establish that that age discrimination was a but-for cause of the employment outcome, i.e., the single motive. Babb, 589 U.S. at 413; Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176 (2009)(holding that, under 29 U.S.C. § 623(a)(1), the private-sector ADEA provision, a plaintiff must demonstrate age was the but-for cause of the employer's adverse action and rejecting mixed-motive jury instructions in that context); see also Smith v. City of Allentown, 589 F.3d 684, 691 (3d Cir. 2009) (confirming that McDonnell Douglas framework may continue to be used in ADEA cases when a plaintiff does not present direct evidence of discrimination).

Moreover, the parties both rely on McDonnell Douglas in their briefing.  So, the court will proceed with evaluating the summary judgment record using this framework.  See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 142 (2000).

2021)(citing Barber v. CSX Distrib. Servs., 68 F.3d 694, 698 (3d Cir. 1995));

Smith v. City of Allentown, 589 F.3d 684, 691 (3d Cir. 2009).

Under this three-step framework, the plaintiff must make a *prima facie*

showing of discrimination to survive summary judgment, i.e., "a claim that on first

sight has enough merit to proceed." Fowler, 19 F.4th at 298–99 (citation omitted).

To demonstrate a *prima facie* age discrimination claim, a plaintiff must show that

he was: (1) over the age of 40; (2) subject to an adverse employment action; (3)

qualified for the position in question; and (4) was ultimately replaced by another

employee who was significantly younger so as to support an inference of a

discriminatory motive. Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d

638, 644 (3d Cir. 2015) (citing Burton v. Teleflex, Inc., 707 F.3d 417, 426 (3d Cir.

2013)).  "Where the plaintiff is not directly replaced, the fourth element is satisfied

if the plaintiff can provide facts which 'if otherwise unexplained, are more likely

than not based on the consideration of impermissible factors.' " Id. (quoting

Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 352 (3d Cir. 1999)).

A *prima facie* showing "is not 'intended to be rigid, mechanized, or

ritualistic[,]' " Willis, 808 F.3d at 644 (quoting Pivirotto, 191 F.3d at 357), but the

showing must be sufficient to convince a reasonable factfinder that all the

elements are met, see Duffy v. Paper Magic Grp., 265 F.3d 163, 167 (3d Cir.

2001).  The facts necessary to establish a *prima facie* case of employment

21

discrimination vary depending on the circumstances of each case. Sarullo v. U.S.
Postal Serv., 352 F.3d 789, 797 nn. 6–7 (3d Cir. 2003)(citing McDonnell Douglas,
411 U.S. at 802, n. 13).

The government challenges two elements of the plaintiff's *prima facie* case,
that is, that he was not subject to adverse employment action and that he cannot
point to facts supporting an inference of discrimination.   The court addresses
these arguments in turn.

### a. Adverse Employment Action

The government argues that many of plaintiff's claims are not "serious and
tangible" enough to qualify as adverse action under the law. (Doc. 39, Df. Br. in
Supp. at 10 (quoting Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir.
2004)).   Plaintiff did not fully address this argument in his opposition brief.[7] (See
Doc. 46).

While the motion for summary judgment awaited decision, however, the
United States Supreme Court decided Muldrow v. City of St. Louis, Missouri, 601
U.S. 346 (2024).[8]  Muldrow rejected standards requiring that the adverse

---

[7] Four months ago, plaintiff suggested that he would move to file a supplemental brief on this
issue, (see Doc. 53), but, to date, he has not.  The court can decide this issue without the aid
of supplemental briefing.

[8] Although the parties briefed this matter before Muldrow was decided, it applies to this case.
See Mitchell v. Garland, No. CV 23-2412 (LLA), 2024 WL 3251217, at *3 (D.D.C. July 1,
2024)(Ali Khan, J.)(citing Thorpe v. Hous. Auth. of Durham, 393 U.S. 268, 281
(1969)(explanatory parenthetical omitted)).

employment action be " 'serious,' 'significant,' 'substantial,' or 'any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar.' " Peifer v. Bd. of Prob. & Parole, 106 F.4th 270, 277 (3d Cir. 2024)(quoting Muldrow, 601 U.S. at 355).  Rather, "an adverse employment action means simply that the employee suffered 'some harm' to a term or condition of employment—in other words, that the employer treated the employee 'worse' because of a protected characteristic."[9] Id.

The government points to thirteen (13) different actions identified in the amended complaint that the plaintiff alleges were discriminatory. (Doc. 39, Def. Br. in Supp. at 5-6 (citing Doc. 13, Am. Compl. ¶¶ 19, 39, 47, 54, 57, 60, 75, 86, 98-99, 108, 121, 129-132, 138, 148)).  Plaintiff only addresses one of these

---

[9] Muldrow involved interpretation of the private-sector anti-discrimination provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1). 601 U.S. at 354–58. The court's research has uncovered only one case where Muldrow has been applied by a district court to a federal-sector ADEA claim. Stepien v. Raimondo, No. 2:21-cv-1410-LK, 2024 WL 4043589, at *14 (W.D. Wash. Sept. 4, 2024)(King, J.). "When conducting statutory interpretation," however, the court "'must be careful not to apply rules applicable under one statute to a different statute without careful and critical examination.' " Gross, 557 U.S. at 174 (quoting Federal Express Corp. v. Holowecki, 552 U.S. 389, 393 (2008)).

Pursuant to Section 633a(a), "a personnel action must be made 'untainted' by discrimination based on age, and the addition of the term 'any' ('free from *any* discrimination based on age') drives the point home." Babb, 589 U.S. at 405 (emphasis in original).  The word "any" in Section 633a(a) has an expansive meaning. Id. at 405, n. 2 (brackets and citations omitted). Additionally, similar to 42 U.S.C. § 2000e–2, there is nothing in the statutory text of 29 U.S.C. § 633a(a) "to otherwise establish an elevated threshold of harm." Muldrow, 601 U.S. at 355. Accordingly, the statute can only be read to encompass various types of discrimination with no reference to severity.  Thus, to the extent that the government argues for a higher standard for adverse action in this case, Muldrow negates that argument.

events:  Brosious being selected as the Health Services Administrator ("HSA") at FCI-Schuylkill instead of the plaintiff despite plaintiff's experience, qualifications, and familiarity with the institution and department. (Doc. 46, Pl. Br. in Opp. at 10-11).  Neither party disputes that plaintiff and Brosious applied for the open position and Brosious got the job. (See Doc. 40, SOF ¶ 11).  This event alone is sufficient to establish an adverse employment action.

Following Muldrow, however, other events complained of by plaintiff also clearly qualify.[10]  For example, in December 2019, the BOP transferred plaintiff to a computer lab away from inmates and changed his duties to monitoring inmate calls and emails. (Doc. 40, SOF ¶ 43).  Then, in February 2020, the BOP transferred plaintiff from the administration building to the prison's satellite camp to continue such monitoring. (Id. ¶¶ 45-46).  On March 9, 2020, the plaintiff was reassigned to provide medical care to the inmates at the satellite camp. (Id. ¶ 53).  After plaintiff expressed discomfort at the new role in a memo to the Clinical Director and Brosious, plaintiff was again reassigned, this time performing COVID-19 screening of staff members at the front lobby of the institution with a different work schedule. (Id. ¶¶ 55-59).  Plaintiff suffered some harm by these

---

[10] In this section of the memorandum, the court will not analyze all of the other twelve (12) allegedly discriminatory events identified by the government in seeking summary judgment. Rather, the court will only address the duty and worksite changes experienced by plaintiff from December 2019 to December 2021.

events: he was stripped of his administrative duties and had his usual working hours changed.  Accordingly, the adverse action element of plaintiff's *prima facie* age-discrimination claim has been met.[11]

### b.    Circumstances Supporting an Inference of Discrimination

The government also argues that the plaintiff cannot establish the fourth element of his *prima facie* case, that is, he cannot show that any of the actions taken against his employment were based on age.  Under the law, the plaintiff may establish the fourth element by "either (1) introduc[ing] evidence of comparators (i.e., similarly situated employees who (a) were not members of the same protected class and (b) were treated more favorably under similar circumstances); or (2) rely[ing] on circumstantial evidence that otherwise shows a causal nexus between his membership in a protected class and the adverse employment action." Greene v. Virgin Islands Water & Power Auth., 557 F. App'x 189, 195 (3d Cir. 2014)(citing Sarullo, 352 F.3d at 797, n. 7).

---

[11] Per the text of Section 633a, the plaintiff only needed to show that these events were "personnel actions." 29 U.S.C. § 633a(a).  To define that term, the court looks to the Civil Service Reform Act of 1978.  See Babb, 589 U.S. at 405 (assuming the definition of "personnel action" from that statute applies to the ADEA).  As defined by the Civil Service Reform Act, a "personnel action" includes "a detail, transfer, or reassignment[,]" and "any other significant change in duties, responsibilities, or working conditions." 5 U.S.C. § 2302(a)(2)(A)(iv), (xii). "Personnel action" also includes "other disciplinary or corrective action[.]" 5 U.S.C. § 2302(a)(2)(A)(iii).

The following is undisputed: in May 2019, plaintiff applied for the vacant HSA position at FCI-Schuylkill at 49 years of age. Pursuant to BOP policy, plaintiff could have only worked until 57 years of age. (Doc. 40, SOF ¶ 10). Instead, the BOP hired Brosious as the prison's new HSA. Brosious was 39 years of age. Accordingly, based on his age at the time, plaintiff had fewer remaining years of service he could ultimately provide to the BOP (eight years) versus Brosious (eighteen years) in an administrative or authoritative role. With these undisputed facts, plaintiff establishes a *prima facie* case regarding not being selected for the Health Services Administrator position.

Plaintiff has also responded to the motion for summary judgment with evidence, which, if unexplained, supports his position that he was then "put out to pasture" based on his age by Brosious and other BOP decision-makers. After plaintiff did not get selected for the HSA position, he advised prison management that he could no longer retire upon first eligibility. (Doc. 46-3, Pl. Decl. ¶ 4). Then, in December 2019, plaintiff was placed under internal investigation for improper use of force when restraining an inmate. (SOF ¶ 26). Per the government, that investigation remained open three years later, even after plaintiff ultimately decided to retire. (Doc. 40-13, Decl. of D. Kenney ¶ 8). From the time the investigation was opened until plaintiff's retirement, the BOP largely tasked plaintiff with monitoring inmate phone calls or screening staff members for

COVID-19 symptoms.  Per plaintiff, Brosious informed him during that time that he would never be allowed back into the main part of the institution. (Doc. 46-3, Pl. Decl. ¶ 15).  As the months passed, plaintiff began noticing that three other younger employees in the Health Services Department were able to frequently change their schedules, while plaintiff was not. (See Doc. 40-8, Pl. Ans. to Interrog. #18).  He wrote to Warden Finley about ageist treatment, but his request for a schedule change was denied. (Doc. 46-20, Pl. Memo to S. Finley 08/05/2020).  With the above, plaintiff has proffered additional evidence to make out the fourth element of a *prima facie* discrimination case.

### c. Whether Plaintiff Has Made a Showing of Pretext

"Once the plaintiff has successfully established a *prima facie* case creating an inference of discrimination, the burden shifts to the employer who must 'articulate a legitimate nondiscriminatory reason for the adverse employment action.' " Willis, 808 F.3d at 644 (quoting Jones v. Sch. Dist. of Phila., 198 F.3d 403, 412 (3d Cir. 1999)(further citation omitted).  The government has advanced that Brosious was more qualified than the plaintiff regarding the HSA position based on more years in prison management.  As for plaintiff's reassignments and changes in duties, the government cites to the ongoing investigation into whether plaintiff used improper force with an inmate and highlights bureaucratic tie-ups

and staffing issues within the BOP.  Such reasons are sufficient to meet defendant's burden of production.

At the third step, "the burden shifts back once more to the plaintiff to show, by a preponderance of the evidence, that the employer's proffered legitimate, nondiscriminatory reason[s] [were] pretextual." Willis, 808 F.3d at 644 (citing Burton, 707 F. 3d at 426–27).  A plaintiff may demonstrate pretext in two ways: 1) by pointing to evidence that would allow a factfinder to disbelieve the employer's reason for the adverse employment action, i.e., weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions; or 2) pointing to evidence with such probative force that would allow a factfinder to conclude that the employer's action was because of age, such as evidence that the defendant treated similarly situated, substantially younger individuals more favorably. See id. at 644–45 (citations omitted).

Plaintiff has countered the government's reasons with sufficient evidence regarding pretext.  For example, on plaintiff's claim regarding his non-selection for the HSA position, plaintiff can point to evidence casting doubt on the reasons articulated for Brosious's selection.  Brosious previously served as an Assistant Health Services Administrator ("ASHA") at a prison complex, FCI-Allenwood, while plaintiff was the ASHA at FCI-Schuylkill, which is a stand-alone institution. Plaintiff was the ASHA at FCI-Schuylkill for more than five years.  Accordingly,

plaintiff had familiarity with the Health Services Department, other staff members, and inmates at the prison, while Brosious did not.  But Brosious was ten years younger and could serve the BOP for a longer period.

Additionally, reasonable factfinders may conclude that the cumulative, cascading nature of the personnel actions experienced by plaintiff after his non-selection reflects that the government's articulated reasons were pretextual.  For the last two years of his employment at the BOP, plaintiff was largely stripped of his previous administrative responsibilities, moved from the main part of the institution and day watch, and assigned tasks like screening inmate phone calls and checking fellow staff members for COVID-19 symptoms.  A jury may look at such evidence and determine that plaintiff was marginalized at work based on his age.  Regarding the ongoing investigation into plaintiff's conduct with inmates, its lack of conclusion cuts both ways.  Reasonable jurors might determine that the proffered red-tape reasons reflect the reality of prison personnel investigations, or they might determine that the investigation was prolonged to force the plaintiff out of the BOP at the moment he became eligible to retire.  That the investigation is still apparently ongoing may cause jurors to disbelieve all of the BOP's reasons for their actions involving the plaintiff in this matter and lead them to a conclusion that plaintiff would not have experienced these work events but-for his age. Consequently, defendant's motion for summary judgment regarding plaintiff's age

discrimination claims in Counts I (the overarching age-discrimination claim) and II (the time-off requests claim), will be denied.

Count IV of plaintiff's amended complaint is a different story. That claim involves retention bonuses allegedly paid to all other members of the Health Services Department, but not the plaintiff. The defendant has proffered evidence that the incentives were paid to healthcare staff with clinical privileges, who could administer care directly to inmates. (Doc. 40, SOF ¶ 70). Per the defendant, plaintiff did not receive the bonus because he let his clinical privileges lapse. (Id. ¶ 72). Furthermore, as indicated, a healthcare staff member older than plaintiff received the bonus. (Id. ¶ 71). Plaintiff has responded to this evidence with a declaration stating, "I was told that retention incentives were offered to all employees" in his department. (Doc. 46-3, Pl. Decl. ¶ 18).

Plaintiff has countered the defendant's evidence in support of summary judgment with a hearsay statement. Additionally, in his brief, plaintiff fails to explain why that statement is not hearsay or how the statement would be admissible at trial. Thus, plaintiff's "somebody told me" evidence is inappropriate to consider at this posture. See Smith, 589 F.3d at 693 ("Hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment.") (citation omitted); see also Bender v. Norfolk S. Corp., 994 F. Supp.

2d 593, 600 (M.D. Pa. 2014).  Consequently, summary judgment will be granted in favor of the defendant on Count IV.

### 3. Hostile Work Environment

Counts I and II of plaintiff's amended complaint also assert discriminatory and retaliatory hostile work environment claims.[12]  Applying the standard for hostile work environment claims to the applicable statute here, 29 U.S.C. § 633a(a), a plaintiff must establish that: 1) the employee suffered intentional discrimination because of his age and/or his protected activity, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability. See Komis v. Sec'y of United States Dep't of Lab., 918 F.3d 289, 293 (3d Cir. 2019)(quoting Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006)); Castleberry v. STI Group, 863 F.3d 259, 263 (3d Cir. 2017)(quoting Mandel v. M & Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013)).

The defendant argues that the events complained of by plaintiff do not qualify as sufficiently "severe or pervasive."  "To determine whether an

---

[12] Although not clearly labeled as a "retaliatory hostile work environment" claim, Count I of plaintiff's amended complaint references that prison executive staff were aware of plaintiff's EEO complaint as of April 2020. (Doc. 13, Am. Compl. ¶¶ 106-107).  Counts I and II then recount additional adverse actions taken against plaintiff after that time.  Accordingly, the court construes the amended complaint as asserting hostile work environment claims based on age and protected activity.  Plaintiff's retaliation claims are discussed in Section 4.

environment is hostile, a court must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " Mandel, 706 F.3d at 168 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).

The defendant takes an event-by-event approach in analyzing the alleged discrimination and hostile work environment claims.  (See Doc. 39, Def. Br. in Supp. 10-11, 26).  But in evaluating hostile work environment claims at the summary judgment stage, it is improper for a district court to parse out each alleged event and view them separately. See Mandel, 706 F.3d at 168.  Rather, the court must consider the overall scenario. Id. (citing Caver v. City of Trenton, 420 F.3d 243, 262–63 (3d Cir. 2005)).  Plaintiff has cited to several events he experienced over his final two years with the BOP following Brosious's hire and plaintiff's report of age discrimination to his agency's EEO office.  Each event cited by the plaintiff builds upon the previous event.  Reviewing the entire timeline and looking at the whole scenario, plaintiff has demonstrated severe or pervasive discrimination.

The defendant also challenges whether such allegedly discriminatory acts would detrimentally affect a reasonable person in like circumstances.  Here too defendant's arguments fall short.  Plaintiff advances that these events were

32

designed to isolate him from his coworkers and then put him on display as an example to those who engaged in protected activity.  (See Doc. 48-3, Pl. Dep. 37:21-38:2, 40:17-41:7, 42:6-16, 48:3-13, 48:3-25).  As plaintiff testified, the shift and schedule changes strained his family life and finances. (Id. 37:5-20; 57:1-10).  He required multiple medications to treat job-related anxiety. (Id. 37:14-20). Accordingly, plaintiff has responded to summary judgment with evidence to put this issue before a jury and the hostile work environment claims raised in Counts I and II will proceed.

Before turning to plaintiff's retaliation claim in Count III, the defendant couples its hostile work environment arguments with assertions that summary judgment is warranted on any claim for constructive discharge. The constructive discharge doctrine, "contemplates a situation in which an employer discriminates against an employee to the point such that his 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.' " Green v. Brennan, 578 U.S. 547, 555 (2016) (quoting Pennsylvania State Police v. Suders, 542 U.S. 129, 141 (2004)).  Constructive discharge "is assimilated to formal discharge for remedial purposes." Suders, 542 U.S. at 141.

"[T]he law does not permit an employee's subjective perceptions to govern a claim of constructive discharge." Clowes v. Allegheny Valley Hosp., 991 F.2d

33

1159, 1161 (3d Cir. 1993)(quoting <u>Gray v. York Newspapers, Inc.</u>, 957 F.2d 1070, 1079 (3d Cir. 1992)(further citation omitted).  Rather, the court employs "an objective standard that asks whether a reasonable person under the circumstances would have felt compelled to resign." <u>Peifer</u>, 106 F.4th at 277 (internal quotation marks and citations omitted).

Factors relevant to a constructive discharge analysis are whether the employer: "(1) threatened the employee with discharge or urged or suggested that she resign or retire, (2) demoted her, (3) reduced her pay or benefits, (4) involuntarily transferred her to a less desirable position, (5) altered her job responsibilities, or (6) gave unsatisfactory job evaluations." <u>Colwell v. Rite Aid Corp.</u>, 602 F.3d 495, 503 (3d Cir. 2010)(citing <u>Clowes</u>, 991 F.2d at 1161)(internal quotation marks and brackets removed).  The absence of these factors is not necessarily dispositive. <u>Duffy</u>, 265 F.3d at 168.

Setting aside plaintiff's feelings about his treatment, a reasonable person under the circumstances advanced by the plaintiff would have felt compelled to retire at the first opportunity before continuing in the plaintiff's position.  To the extent that constructive discharge fits into plaintiff's discrimination and hostile work environment claims, the motion for summary judgment will be denied.

### 4. Retaliation

The defendant also moves for summary judgment on plaintiff's claim for retaliation, which is pled in Count III of the amended complaint. ADEA retaliation claims in the federal sector are also asserted through Section 633a(a), not through a separate statutory provision. See Gomez-Perez, 553 U.S. at 486–90.

As drafted, Count III is fact-specific and limited: that Warden Finley denied plaintiff's requests for schedule changes on August 6, 2020, and referred to plaintiff's counsel during a meeting to discuss those requests. (Doc. 13, Am. Compl. ¶¶ 128-136). In his brief in opposition, however, plaintiff argues that all personnel actions taken against him after he contacted the agency's EEO office should be considered as part of his retaliation claims, that is from March 17, 2020 forward.

The defendant notes plaintiff's attempts to group these other events into the retaliation claim for the first time at this procedural posture. (Doc. 49, Def. Rep. Br. at 11–12). And the law provides that causes of action cannot be read into the complaint when they are not present. Krouse v. Am. Sterilizer Co., 126 F.3d 494, 499 (3d Cir. 1997). Furthermore, the court need not consider additional claims raised for the first time in an opposition brief. Johnson v. Cmty. Coll. of Allegheny Cnty., 566 F. Supp. 2d 405, 449 (W.D. Pa. 2008)(collecting cases).

35

The federal-sector ADEA statute, however, has been interpreted to contain an anti-retaliation provision because "retaliation for complaining about age discrimination is 'discrimination based on age[.]' ". Gomez-Perez, 553 U.S. at 488 (referencing 29 U.S.C. § 633a(a)) (additional citations omitted).  Moreover, plaintiff's amended complaint avers these other work events in detail regarding his discrimination claims, and the government was on notice that plaintiff would advance his claims by reference to these events.  Furthermore, as discussed below, in evaluating retaliation claims, context matters.  Plaintiff's retaliation claim thus requires consideration of all the circumstances plaintiff faced during his employment.  The court will thus consider these other events as part of plaintiff's retaliation claim despite the way the claim was pleaded in the amended complaint.

Under the McDonnell Douglas framework, a plaintiff asserting a retaliation claim first must establish a *prima facie* case by showing (1) that he engaged in protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.  Daniels, 776 F.3d at 193 (brackets, internal quotation marks, and citations omitted).  The government argues that plaintiff cannot demonstrate

36

adverse action or causation. (Doc. 39, Def. Br. in Opp. at 28-29; Doc. 49, Def.

Rep. Br. at 12-13).  The court disagrees.

To satisfy the adverse action element in his retaliation claim, "the plaintiff

'must show that a reasonable employee would have found the challenged action

materially adverse, which in this context means it well might have dissuaded a

reasonable worker from making or supporting a charge of discrimination.' "

Daniels, 776 F.3d at 195 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548

U.S. 53, 68 (2006)).[13]   Whether adverse action is materially adverse "depends

upon the circumstances of the particular case, and 'should be judged from the

perspective of a reasonable person in the plaintiff's position considering 'all the

circumstances.' " White, 548 U.S. at 71 (quoting Oncale v. Sundowner Offshore

Servs., Inc., 523 U.S. 75, 81 (1998)).  While petty slights, minor annoyances, and

simple lack of good manners will generally not suffice, context matters. See id. at

68–69; Daniels, 776 F.3d at 196.  Acts that would be immaterial in some

situations can be material in others. See White, 548 U.S. at 69 (citation omitted).

Considering all the circumstances in context and viewing the summary

judgment record from an objective standpoint, a reasonable jury may conclude

---

[13] The majority in Muldrow rejected the application of the "materially adverse" action standard
from Title VII retaliation claims to discrimination claims and referred to the higher standard as
"frankly extra-textual." 601 U.S. at 357 (discussing White, 548 U.S. at 63, 68).  Neither the
United States Supreme Court nor the Third Circuit Court of Appeals have squarely addressed
whether the standard articulated in Muldrow is applicable to retaliation claims.  Absent further
jurisprudence, the standard from White applies.

that plaintiff experienced materially adverse actions following his contact with the agency's EEO office.  As detailed above, plaintiff's duties were modified following the inmate investigation.  Based on events between December 2019 and March 2020, which plaintiff believed were discriminatory, plaintiff contacted the EEO office shortly after he was reassigned to provide frontline care to inmates at the satellite camp.  He then detailed issues with the satellite camp reassignment to his supervisor, Brosious, and the prison's Clinical Director in a memo. Specifically, he advised that the reassignment violated prison policy.  Brosious responded by reassigning plaintiff again *and* changing his workdays and hours. This impacted plaintiff's ability to commute more economically though a van pool as he detailed in his written request for EEO counseling dated April 28, 2020. (Doc. 46-4).  EEO counseling continued for several months, and the EEO counselor interviewed several prison employees and executive staff members, including Brosious, Warden Finley, and the Clinical Director.  In the interim, Brosious provided plaintiff with the "achieved results minimally" evaluation, and the Acting Associate Warden, Ryan Miller, issued plaintiff a memorandum directing him to refrain from using unprofessional conduct.   Plaintiff then appealed to Warden Finley on August 5, 2020, to return to day shift with weekends off due to financial hardships and the burdens placed on plaintiff's ability to spend time with his children. (Doc. 46-20).  Plaintiff also advised the

38

warden that younger department members were provided the opportunity to modify their work schedules. (Id.) Warden Finley denied plaintiff's request. (Id.). Plaintiff ultimately did not return to day watch until July 26, 2021. (Doc. 46-25, B. Brosious Memo to Pl. 07/22/2021).

Looking at the above facts in a light most favorable to plaintiff, a reasonable worker would not have alleged age discrimination and engaged in protected activity if the worker knew, after making that report, that he would be moved to the night shift with different days off and kept on that schedule for sixteen (16) months. Accordingly, materially adverse action has been demonstrated.

As for the causation element of a retaliation claim, a plaintiff may rely on a broad array of evidence to demonstrate the causal link between protected activity and the adverse employment action taken. See Carvalho-Grevious v. Delaware State Univ., 851 F.3d 249, 260 (3d Cir. 2017)(citing Marra v. Philadelphia Hous. Auth., 497 F.3d 286, 302 (3d Cir. 2007); Farrell v. Planters Lifesavers Co., 206 F.3d 271, 284 (3d Cir. 2000)). A plaintiff can meet this burden by proffering evidence of inconsistent explanations by an employer for taking an adverse employment action, a pattern of antagonism, or temporal proximity unusually suggestive of retaliatory motive. Id. (citations omitted). Moreover, the proffered evidence, when looked at as a whole, may also suffice to raise the inference of causation. See Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir.

39

1997)(citing Waddell v. Small Tube Prods., Inc., 799 F.2d 69, 73 (3d Cir. 1986).
Without rehashing the timeline set forth above, the chronology of events and
broad array of evidence presented by plaintiff is sufficient to meet the causation
element.  Accordingly, plaintiff has made a *prima facie* retaliation case.

Likewise, after an employer sets forth legitimate non-retaliatory reasons,
which are noted above in this case, "the plaintiff must be able to convince the
factfinder both that the employer's proffered explanation was false, and that
retaliation was the real reason for the adverse employment action." Krouse, 126
F.3d at 500–01.  Plaintiff has advanced that the schedule change he experienced
after he contacted the EEO office was accompanied with being assigned duties
of screening staff members for COVID-19 in the lobby of FCI-Schuylkill.  He
testified:

> Q.     Okay.  Then you talked about then they gave you
> some different duties with this new schedule.  Who made
> that decision?
>
> A.     That came from Mr. Brosious. I'm not sure who
> made the decision. Mr. Finley, being the warden, I would
> imagine he had a part in it.  But immediately following,
> within about two or three hours, I was -- thought I was being
> retaliated against for my EEO case and for submitting this
> memo, because I didn't feel comfortable.  So they thought,
> well, we'll just shove him on evening watch with Monday
> and Tuesday off.
>
> …

> Q.    All right. So that brings us to March 2020. What's the next thing that happened that you would consider harassment or retaliation?
>
> A.    They moved me to the front lobby on evening watch. As I perceived it, as a trophy of the warden, that he can do whatever he wants to anybody at any given time. I had to see every employee in and out of the institution on a daily basis.  It was very demoralizing to me.

(Doc. 48-3, Pl. Dep. 48:3-13, 48:18-25).

The court has already noted above where certain evidence, if credited by the factfinder, could be used to determine that the prison's reasons for plaintiff's reassignments and schedule changes were pretext for age discrimination.  A jury could consider much of that same evidence and determine that plaintiff received harsher treatment following his contact with the EEO office about age discrimination and after his request for EEO counseling.  The motives of Brosious and Warden Finley remain questions for the jury.  Under these circumstances, the government's motion for summary judgment on plaintiff's retaliation claim will be denied.

**Conclusion**

For the reasons set forth above, the defendant's motion for summary judgment (Doc. 35) will be granted in part and denied in part.  Judgment will be entered in favor of the defendant on Counts IV and V of plaintiff's amended

41

complaint.  The motion for summary judgment will be denied in all other respects.

An appropriate order follows.


Date: _9/17/24_                               _____
                                              JUDGE JULIA K. MUNLEY
                                              United States District Court